[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-11341
_____

D.C. Docket No. 8:15-cv-01544-EAK-AEP


UNIVERSITY OF SOUTH FLORIDA BOARD OF TRUSTEES,
a public body corporate of the State of Florida,

Plaintiff-Appellant,

versus

COMENTIS, INC.,
a Delaware corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 30, 2017)


Before HULL, MARCUS, and ROGERS,[*] Circuit Judges.

ROGERS, Circuit Judge:

_____

[*] Honorable John M. Rogers, United States Circuit Judge for the Sixth Circuit, sitting by designation.

The board of trustees of the University of South Florida sued CoMentis, Inc., in federal court, asserting jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a). The district court dismissed the complaint on the merits, and the university appeals. However, because the plaintiff state university is an arm of the state, it is not a "citizen" of the state for diversity jurisdiction purposes. As the plaintiff now concedes on appeal, the district court should therefore have dismissed the suit for lack of jurisdiction. This conclusion is required by the same analysis that would give the university Eleventh Amendment immunity if sued in federal court.

While Congress has authorized diversity jurisdiction over suits between "citizens of different States," 28 U.S.C. § 1332(a)(1), that authorization does not extend to suits between a state and a citizen of another state because "a state is not a citizen of a state for the purpose of diversity jurisdiction under 28 U.S.C. § 1332," *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 412 (11th Cir. 1999) (citing *Moor v. Alameda Cty.*, 411 U.S. 693, 717 (1973)). Similarly, the statutory authorization does not extend to suits between "[a] public entity or political subdivision of a state" and a citizen of another state, if the entity or division is "simply an 'arm or alter ego of the State.'" *Univ. of S. Ala.*, 168 F.3d at 412 (citing *Moor*, 411 U.S. at 717–18). "Therefore, if a party is deemed to be 'an arm or alter

2

ego of the State,' then diversity jurisdiction must fail" under 28 U.S.C.

§ 1332(a)(1). *Univ. of S. Ala.*, 168 F.3d at 412.

The USF Board is an "arm or alter ego of the State" for diversity jurisdiction because it meets the same test that applies to determining whether the USF Board is entitled to Eleventh Amendment immunity. We have held that the Eleventh Amendment immunity analysis applies to determinations of citizenship for diversity jurisdiction purposes. *Id.*; *see also Coastal Petroleum Co. v. U.S.S. Agri–Chems.*, 695 F.2d 1314, 1318 (11th Cir. 1983).

The USF Board is an "arm" of Florida because the State of Florida defines the USF Board to be a part of its government, exercises great control over it, funds it, and pays judgments entered against it. We have repeatedly applied this test in determining whether a state entity is entitled to Eleventh Amendment immunity. *See Tuveson v. Fla. Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir. 1984) (stating the four-factor test); *see also, e.g.*, *Williams v. District Bd. of Trs. of Edison Cmty. Coll., Fla.*, 421 F.3d 1190, 1192 (11th Cir. 2005) (per curiam); *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc).

First, Florida defines the USF Board to be a part of the state government. Florida lists USF as a "[s]tate university." Fla. Stat. § 1000.21(6)(d). Florida declares that the "boards of trustees [of state universities] are a part of the

3

executive branch of state government." *Id.* § 1001.71(3). The state therefore clearly defines the USF Board to be a part of its government.

This conclusion is strongly supported by our decision in *Williams*, in which we held that a Florida community college was entitled to Eleventh Amendment immunity. We concluded that "[a] community college is a creature of state law," *Williams*, 421 F.3d at 1194–95, and stated that that conclusion "favor[ed] a determination that a community college is an arm of the state," *id.* at 1193. In doing so we relied on Florida's statutory provisions that empower the state government to supervise the community colleges, *id.* at 1192–93, although we also noted that "[t]he board of a community college is not an agent of the executive branch of state government under Florida law," *id.* at 1193. Florida law empowers the state government to control community colleges and state universities similarly, *compare* Fla. Stat. § 1004.21–32 (state universities), *with id.* § 1004.65–726 (community colleges), and while we indicated in *Williams* that a Florida community college is not an agent of the state's executive branch, Florida explicitly defines the board of trustees of a state university to be a part of the state government's executive branch. *Id.* § 1001.71(3).

Second, the State of Florida exercises great control over the USF Board by defining the USF Board's powers and by appointing its members. The USF Board is not only subject to control by a statewide Board of Governors, but the USF

Board itself is appointed mostly by the state Governor or the Board of Governors. Of the USF Board's thirteen members, six are appointed by the Governor of Florida, and five by the Board of Governors. Fla. Const. art. IX, § 7(c).

The Florida Constitution states that "[t]here shall be a single state university system," that "[a] board of trustees shall administer each public university," and that "a board of governors shall govern the state university system." Fla. Const. art. IX, § 7(b). The Board of Governors is almost entirely appointed by the Governor of Florida.[1] That Board of Governors "establish[es] the powers and duties of the boards of trustees" of state universities. Fla. Const. art. IX, § 7(c). The Board of Governors also closely scrutinizes the USF Board's activities, as it "oversee[s] the enforcement of all state university laws and rules and regulations and the timely provision of direction, resources, assistance, intervention when needed, and strong incentives and disincentives to force accountability for results." Fla. Stat. § 1000.03(2)(c).

Third, the State of Florida funds USF. While the USF Board initially prepares the budget, Fla. Bd. of Governors Reg. 1.001(6)(a), the Board of Governors must approve the proposed budget, *id.*, and submits the approved

---

[1] "[T]he Board of Governors is established as a body corporate comprised of 17 members as follows: 14 citizen members appointed by the Governor subject to confirmation by the Senate; the Commissioner of Education; the chair of the advisory council of faculty senates or the equivalent; and the president of the Florida student association or the equivalent." Fla. Stat. § 1001.70(1); *see also* Fla. Const. art. IX, § 7(d).

budget, along with the approved budgets of all other state universities, to the state legislature, Fla. Stat. § 1001.705(2)(f).  The Board of Governors sets rules for any independent fundraising by the USF Board through tuition and fees.  Fla. Bd. of Governors Reg. 1.001(6)(b).  The Board of Governors also annually audits the USF Board's finances.  *Id.* at 1.001(6)(g).

Finally, Florida ultimately pays the judgments entered against the USF Board.  While each state university board of trustees is "a public body corporate" that can enter into contracts, sue and be sued, implead and be impleaded, and therefore hold property and have judgments entered against them, Fla. Stat. § 1001.72(1), (3), Florida ultimately pays such judgments.  Not only does the state legislature fund the USF's budget as determined under the executive branch's control, the Board of Governors secures a comprehensive general liability insurance for state universities, *id.* § 1001.706(4)(d), and the boards of trustees must maintain coverage under the State Risk Management Trust Fund, *id.* § 1001.72(2).  Florida ultimately pays any judgments entered against the USF Board by funding the USF's activities in general, and by mandating the USF's enrolling in risk-management insurance.  Examining a similar insurance scheme for community colleges, we reasoned in *Williams* that the state "laws [that] ensure that community colleges are able to satisfy their liabilities . . . reflect that the state

6

is ultimately responsible for those liabilities." *Williams*, 421 F.3d at 1194. The same is true here.

Unsurprisingly given how tightly Florida's government controls its public education system, we have concluded, for Eleventh Amendment purposes, that boards of trustees of Florida's community colleges are "arms" of the state, *id.* at 1195, and also in unpublished opinions that the boards of trustees of Florida's state universities are "arms" of the state, *Crisman v. Fla. Atl. Univ. Bd. of Trs.*, 572 F. App'x 946 (11th Cir. 2014) (per curiam); *Luna v. Larkin*, 563 F. App'x 739 (11th Cir. 2014) (per curiam); *Hillemann v. Univ. of Cent. Fla.*, 167 F. App'x 747, 748 (11th Cir. 2006) (per curiam); *see also Irwin v. Miami-Dade Cty. Pub. Schs.*, 398 F. App'x 503, 507 (11th Cir. 2010) (per curiam). District courts have reached the same result, in some cases with respect to the USF Board in particular. *See, e.g.*, *Debose v. Univ. of S. Fla.*, No: 8:15-cv-2787, 2016 WL 1367173 (M.D. Fla. April 5, 2016); *Schultz v. Bd. of Trs. of Univ. of W. Fla.*, No. 3:06cv442, 2007 WL 1490714 (N.D. Fla. May 21, 2007); *Dismuke v. Univ. S. Fla. Bd. of Trs.*, No. 8:05-CV-340, 2006 WL 166547 (M.D. Fla. Jan. 23, 2006).

To resist that analysis and to avoid those authorities, CoMentis argues that a different test applies to determine whether the USF Board is an "arm" of the state for diversity jurisdiction. Instead of the above four-factor Eleventh Amendment test from *Tuveson*, CoMentis argues, a five-factor test from *Coastal Petroleum*

7

controls for diversity jurisdiction, a test that focuses on whether the entity has corporate powers such as the power to sue, to contract, and to plead in court. *See Coastal Petroleum*, 695 F.2d at 1318.[2] To accept the possibility of some daylight between the two tests would mean that some state entity might be entitled to Eleventh Amendment immunity, but still be able to bring a federal suit alleging diversity jurisdiction.

Having different tests would not be entirely anomalous. The purposes of diversity jurisdiction are somewhat different from those of the Eleventh Amendment. A federal court in Hawaii has pointed out the "divergent rationales for Eleventh Amendment immunity and diversity jurisdiction," with the former "aim[ing] to protect states from lawsuits," and the latter "meant to limit states' appearances in federal court," suggesting that emphasizing the inquiry into the ultimate payer of judgments therefore makes sense in the Eleventh Amendment context, but not so much in the jurisdictional context. *Befitel v. Glob. Horizons, Inc.*, 461 F. Supp. 2d 1218, 1222 (D. Haw. 2006); *see also Univ. of R.I. v. A.W.*

---

[2] "These factors have been approved by this circuit and are as follows: (1) whether the agency can be sued in its own name; (2) whether the agency can implead and be impleaded in any competent court; (3) whether the agency can contract in its own name; (4) whether the agency can acquire, hold title to, and dispose of property in its own name; and (5) whether the agency can be considered a "body corporate" having the rights, powers and immunities incident to corporations." *Id.* (citing *C.H. Leavall & Co. v. Bd. of Comm'ns of Port of New Orleans*, 424 F.2d 764 (5th Cir.1970), and *Centraal Stikstof Verkoopkantor, N.V. v. Ala. State Docks Dep't*, 415 F.2d 452 (5th Cir.1969)).

*Chesterton Co.*, 2 F.3d 1200, 1202 n.4 (1st Cir. 1993).  In addition, a district court opinion that our predecessor Fifth Circuit referred to as "very scholarly and well reasoned," *Centraal Stikstof Verkoopkantoor*, 415 F.2d at 457 n.3, conspicuously left open whether being an arm of the state for Eleventh Amendment purposes means that an entity is not a citizen for diversity purposes, while explicitly holding the reverse, i.e., that not being an arm of the state for Eleventh Amendment purposes means that a public entity is a citizen for diversity purposes, *S.J. Groves & Sons Co. v. New Jersey Turnpike Auth.*, 268 F. Supp. 568, 573 (D.N.J. 1967). Moreover, tying the two doctrines means for instance that a state arm cannot agree to resolve its contract suits with out-of-state vendors in federal court even if it wants to, because even though a state can waive its Eleventh Amendment immunity, *e.g.*, *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999), it cannot waive limits on diversity jurisdiction.

Nevertheless, CoMentis's argument fails for the following reasons.

First, we have already held that the Eleventh Amendment test controls the diversity jurisdiction analysis, while recognizing that the two contexts are different.  In 1983, in the very case on which CoMentis relies to argue for a different test, we stated: "Although the determination made by the court in *Aerojet* concerned eleventh amendment immunity, we conclude that the analysis for determining the Board's status as a 'citizen' for the purposes of diversity is the

9

same." *Coastal Petroleum*, 695 F.2d at 1318 (citing *Aerojet-Gen. Corp. v. Askew*, 453 F.2d 819 (5th Cir. 1971)).  In 1998, we stated again: "Although the question of diversity jurisdiction is distinct from that of immunity, we have also held that the Eleventh Amendment immunity analysis is applicable to determinations of citizenship for the purpose of diversity jurisdiction." *Univ. of S. Ala.*, 168 F.3d at 412 (citing *Coastal Petroleum*, 695 F.2d at 1318) (internal citation omitted).  Other circuits as well have embraced Eleventh Amendment tests like *Tuveson*'s to determine whether an entity is an "arm" of a state for diversity jurisdiction.  *See, e.g.*, *Pub. Sch. Ret. Sys. v. State St. Bank & Trust Co.*, 640 F.3d 821, 826–27 (8th Cir. 2011); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260–61 (4th Cir. 2005); *A.W. Chesterton*, 2 F.3d at 1202 n.4, 1203 (1st Cir. 1995); *Blake v. Kline*, 612 F.2d 718, 726 (3d Cir. 1979).

Second, while in *Coastal Petroleum* we held that an entity was a citizen of the state for diversity jurisdiction, we did so first and foremost because controlling Fifth Circuit precedent, *Aerojet-General*, had held that the same entity was not entitled to Eleventh Amendment immunity, in particular because "the appropriate Florida statutes had vested title to the land in question with the" entity.  695  F.2d at 1317–18.  It is true that we added a three-sentence paragraph identifying the five-factor analysis used by the district court in that case, noting that the factors "have been approved by this circuit."  *Id.* at 1318.  We did not proceed to apply the

10

factors, however, but instead cited two Fifth Circuit cases that themselves did not apply the five factors.  The final sentence of the paragraph referred back to *Aerojet* and summarily stated our conclusion:  "Because the state has vested title of the land in the Trustees and because the Trustees have acted and continue to act as a separate and distinct entity from the state, we hold that the trustees are a citizen within the meaning of diversity jurisdiction under 28 U.S.C. § 1332 (1976)." *Id.* This paragraph hardly amounts to an application of a new and different standard for the determination of whether an entity is an arm of the state for diversity jurisdiction purposes.

Because the USF Board is an arm of the Florida state government, the district court lacked diversity jurisdiction over the suit between it and CoMentis, a citizen of another state.  We therefore vacate the order below, and remand the case to the district court with instructions to dismiss the complaint for lack of subject matter jurisdiction.