[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12381
_____

D.C. Docket No. 5:15-cv-01750-AKK

WEST MORGAN-EAST LAWRENCE WATER AND SEWER AUTHORITY, et al.,

                                        Plaintiffs-Appellees,

CHARLES OWENS, et al.,

                                        Interested Parties-Appellants,

versus

3M COMPANY,
DYNEON, LLC,
DAIKIN AMERICA, INC.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(June 4, 2018)

Before WILSON and BLACK, Circuit Judges, and SCHLESINGER,[*] District Judge.

PER CURIAM:

Defendants 3M Company (3M), Dyneon, LLC (Dyneon), and Daikin America, Inc. (Daikin) are manufacturing companies accused of polluting a water supply in northern Alabama. Plaintiffs are parties allegedly affected by that pollution—the West Morgan-East Lawrence Water and Sewer Authority (the Water Authority) and a proposed class of individuals and businesses who purchased water from the Water Authority (the Class). The district court, over the objection of approximately 300 proposed class members (Objectors), certified a class under Federal Rule of Civil Procedure 23(b)(2) and approved a partial class settlement between Plaintiffs and Daikin.

Objectors contend the district court abused its discretion in certifying the class and approving the settlement because: (1) conflicting interests between the Water Authority and the Class required separate counsel for negotiations; (2) the settlement released absent class members' individualized claims for monetary damages; (3) the class representatives' claims were not typical of all class members' claims; and (4) the settlement was not fair, reasonable, and adequate.

---

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of Florida, sitting by designation.

We conclude the district court abused its discretion because Plaintiffs' counsel was conflicted and because the settlement impermissibly released absent class members' individualized claims for monetary damages.[1] We therefore vacate the class certification, reverse approval of the settlement, and remand for further proceedings.[2]

## I. BACKGROUND

Perfluorinated chemicals (PFCs) are used for a variety of industrial purposes. Until recently, two of the most commonly used PFCs were perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS). If ingested,

[1] Because we reverse approval of the settlement for these reasons, we do not address Objectors' arguments concerning typicality or whether the settlement was otherwise fair, reasonable, and adequate.

[2] We asked the parties to respond to a jurisdictional question regarding diversity jurisdiction, and the parties submitted a joint response. Plaintiffs also submitted an unopposed motion to amend some of their jurisdictional allegations. We conclude that Plaintiffs' operative complaint fails to sufficiently allege the parties' citizenships. But we grant the motion to amend and allow the case to proceed because Plaintiffs' amended allegations are adequate to establish diversity jurisdiction. We also hold that the Water Authority is not an arm of the state for purposes of determining its citizenship. *See Univ. of S. Fla. Bd. of Trs. v. CoMentis, Inc.*, 861 F.3d 1234, 1235 (11th Cir. 2017) (explaining that "Eleventh Amendment immunity analysis applies to determinations of citizenship for diversity jurisdiction purposes"); *Tuveson v. Fla. Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir. 1984) (stating four-factor test for immunity under the Eleventh Amendment). The plain language of the statute under which the Water Authority was formed indicates the Water Authority is an *independent* instrumentality of the state, and Alabama neither controls nor funds it. *See* Ala. Code §§ 11-88-2, 11-88-7(a)(2), 11-88-12. Further, Alabama courts have determined that water authorities are independent from the state. *See Water & Wastewater Bd. v. City of Athens*, 17 So. 3d 241, 244 (Ala. Civ. App. 2009) ("[I]t is without question that the [Water and Wastewater] Board is not the State or a county."); *Limestone Cty. Water & Sewer Auth. v. City of Athens*, 896 So. 2d 531, 535–36 (Ala. Civ. App. 2004) ("[A] public corporation is an 'instrumentality of the state' in the sense that it is created pursuant to the laws of the State and for the public benefit, but it is 'independent' of the State and 'is not an agency of the state' because the State does not own or operate the corporation.").

PFOA and PFOS remain in the body for a long time and may pose serious health risks.  Defendants used these PFCs in their manufacturing facilities, located in Decatur, Alabama, and they allegedly released these chemicals into the Tennessee River.

The Water Authority draws its water from the Tennessee River, approximately thirteen miles downstream from Defendants' facilities.  That water is then treated and distributed to at least 57,000 customers.[3]  Since 2009, the Water Authority has tested its water supply and consistently found levels of PFOA and PFOS exceeding the maximum allowable under guidelines issued by the Environmental Protection Agency (EPA).  The Water Authority attributes the excessive PFOA and PFOS levels to Defendants' alleged pollution.

In October 2015, the Water Authority and three of its customers, all represented by the same counsel, sued Defendants for contaminating the water supply.  Although the Water Authority sued on its own behalf, the three customers purported to act on behalf of a proposed class of "all owners and possessors of property who use water provided by [either the Water Authority or one of its wholesale customers]."

---

[3] The Water Authority services approximately 25,000 to 35,000 customers directly; it provides water on a wholesale basis to other utilities that, in turn, provide the water to an additional 32,000 to 44,000 individual customers.

4

In their operative amended complaint, Plaintiffs allege counts for negligence, nuisance, and battery. The remedies sought by the Water Authority, however, differ significantly from the relief sought by its customers. The Water Authority seeks damages "sufficient to compensate it for real property damage, loss of use of property, out-of-pocket expenditures, and reasonably ascertainable future expenditures." Its customers, on the other hand, seek damages "sufficient to compensate them for real property damage, loss of use and enjoyment of property, loss of quality of life, aggravation and inconvenience, mental anguish, and out-of-pocket expenditures and reasonably ascertainable future expenditures." Both the Water Authority and its customers seek punitive damages, as well as "an injunction requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiffs and to prevent these chemicals and toxins from continuing to contaminate Plaintiffs' water supplies."

Months after Plaintiffs filed their initial complaint, the EPA released a new health advisory that drastically reduced the threshold levels at which PFC consumption was deemed unsafe. It also advised providers of public drinking water to "promptly notify consumers" if PFOA and PFOS levels in their systems exceeded EPA guidelines. The Water Authority therefore notified its customers of the contamination. And because its treatment methods were (at that time)

5

incapable of reducing the contamination to safe levels, the Water Authority began exploring other options for providing safe water to its customers.

The Water Authority eventually determined it would need a new treatment process. In the short term, it would need to install a Granular-Activated-Carbon (GAC) system to remove PFOS and PFOA, at a cost of approximately $4 million. That system, which was financed through a bond issuance, is now in place and appears to be functioning as planned. But a Reverse-Osmosis System, which is highly effective at removing PFOA, PFOS, and other PFCs, will eventually be needed.

For the month following the EPA's May 2016 health advisory, the Water Authority continued to bill its customers as usual, despite advising them not to drink the water. In August 2016, a separate group of approximately 400 Water Authority customers filed suit in Alabama state court, asserting claims against the Defendants *and* the Water Authority (the *Billings* case). Soon after, Plaintiffs executed a memorandum of understanding with Daikin outlining the principal terms of a partial settlement in the case now on appeal. That memorandum of understanding was superseded by a settlement agreement executed and filed with the district court for approval in November 2016.

Under the terms of the settlement agreement, Daikin agreed to pay $5 million, with estimated benefits to class members of $6 million.[4] Of the $5 million, $4 million was earmarked to go to the Water Authority to fund the costs of the GAC system that otherwise would be passed on to the Class,[5] $450 thousand was to go to the Water Authority to be used to credit the accounts of class members who were billed during the period when they were unable to drink the water,[6] and the last $550 thousand was for Plaintiffs' attorney's fees and costs. In exchange for the $5 million payment, the class members agreed to release their claims against Daikin—except for claims involving manifest personal injury[7] or property damage unrelated to the delivery of water from the Water Authority.

Plaintiffs and Daikin moved for conditional class certification and preliminary approval of the settlement. Meanwhile, before the district court ruled

---

[4] The estimated $1 million additional benefit is based primarily on the interest saved on the $4 million bond issued by the Water Authority to fund the GAC system. Because the Water Authority is obligated by law to pass its operating costs on to its customers, the class members would ultimately be responsible for paying that interest.

[5] *See* Ala. Code § 11-88-12.

[6] Residential class members and water utilities would receive a full credit, commercial customers would receive a partial credit, and utilities that stopped purchasing water from the Water Authority during June or July 2016 would receive a credit in the form of forgiveness of contracted minimum water purchases.

[7] Under Alabama law, manifest personal injuries are those characterized by "observable signs or symptoms or the existence of which is medically identifiable," "even if the injured person is ignorant of [the injury] for some period after its development." *Griffin v. Unocal Corp.*, 990 So. 2d 291, 293, 310 (Ala. 2008) (adopting Justice Harwood's definition of "manifest" in his dissenting opinion in *Cline v. Ashland, Inc.*, 970 So. 2d 755, 773 (Ala. 2007)).

7

on the request, approximately 300 Water Authority customers—the Objectors in this case—filed their own state-court lawsuit against Defendants (the *Owens* case). The district court preliminarily accepted the settlement in February 2017 and conditionally certified a settlement class under Federal Rule of Civil Procedure 23(b)(2) as "all owners and possessors of property as of February 21, 2017 who use water provided by [either the Water Authority or one of its wholesale customers]."  It also scheduled a fairness hearing to be held in May 2017.

A month before the hearing, Objectors filed their objections to the settlement, arguing: (1) class counsel had a conflict of interest because it purported to represent the interests of both the Water Authority and the Class; (2) the proposed class did not meet the requirements of Rule 23(b)(2); and (3) Rule 23(a)(3) was not satisfied because the representative plaintiffs' claims were not typical of all class members.

The district court conducted a fairness hearing, at which the Objectors were the only objecting participants.  Notably, the *Billings* plaintiffs, who had filed claims directly against the Water Authority, did not object to the settlement on the basis of a potential conflict.  At the conclusion of the hearing, the district court announced its inclination to overrule the objections.

As to the Objectors' Rule 23(b)(2) argument, the district court opined that because the issue involved a settlement, the analysis of whether the class may be

8

certified under Rule 23(b)(2) must focus on the relief that's being provided as part of the settlement. That relief, according to the district court, "is injunctive in nature and certainly predominates over any individual damages that the class may have." The district court further rejected the suggestion of a settlement allowing class members to opt out, because class members should not be allowed to benefit from injunctive relief funded by Daikin (the GAC system) without giving up their claims.[8]

The district court also rejected the idea that an impermissible conflict was present:

> I don't believe that there's a conflict, but I am worried that I may be overly dismissive of the points that [Objectors' counsel] made. My thinking is this: The interests of the authority and the customers are aligned. And both -- the authority obviously is charged with providing clean water to its customers. That clean water has been impacted by the contaminants, and both the authority and the customer class were affected by the contamination.

> And so, from my perspective, I don't see a conflict. And I certainly also don't see a conflict in the settlement that's proposed here, as well.

> The clean water component of the settlement not only benefits the authority, but also benefits the customers by providing them with clean water. And then, . . . in addition to the clean water is also a cost benefit to the customers by them not having to pay any costs for upgrading this system going forward.

---

[8] The district court did not explain how this reasoning was consistent with allowing class members to retain their individualized claims for manifest personal injury and property damage as part of the settlement.

9

The district court therefore entered an order approving the settlement and certifying a settling class under Rule 23(b)(2) as "[a]ll owners and possessors of property as of February 21, 2017, who use water provided by the [Water Authority or its wholesale customers]." Final judgment was entered dismissing with prejudice all of the Class's released claims against Daikin, certifying that all class members would be bound by the judgment, and noting that all claims against defendants 3M and Dyneon would remain pending. Objectors filed a timely notice of appeal.

## II. DISCUSSION

*A. Standard of Review*

We review the district court's approval of a class settlement for abuse of discretion. *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1240 (11th Cir. 2011). As long as the district court's "decision does not amount to a clear error of judgment we will not reverse even if we would have gone the other way had the choice been ours to make." *Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1288 (11th Cir. 2009). Nevertheless, "[a] district court by definition abuses its discretion in relying on an erroneous interpretation of applicable law." *Jackson v. Crosby*, 437 F.3d 1290, 1295 (11th Cir. 2006). And we review de novo "[w]hether the district court applied the correct legal standard in reaching its

decision on class certification." *London v. Wal-Mart Stores, Inc.*, 340 F.3d 1246, 1251 (11th Cir. 2003) (quotation omitted).

## B. Conflicted Counsel

Objectors contend the Class's interests could not adequately be represented by counsel purporting to negotiate on behalf of both the Water Authority and the Class, because their interests were inherently conflicted. We agree.

"[C]lass actions are rife with potential conflicts of interest between class counsel and class members." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). District courts must therefore "give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Id.* A class action may only be maintained if class counsel "fairly and adequately represent[s] the interests of the class." Fed. R. Civ. P. 23(g)(4). This requirement, aimed at ensuring the rights of absent class members are vigorously protected, is not satisfied where class counsel represents parties whose interests are fundamentally conflicted. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856, 119 S. Ct. 2295, 2319 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n. 20, 117 S. Ct. 2231, 2251 n.20 (1997); *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003); *London*, 340 F.3d at 1253.

11

The district court in this case determined there was no conflict because both the Water Authority and the Class share a common interest in pursuing injunctive relief against Defendants. The district court was partially correct—the Water Authority and the Class do indeed share a common interest in obtaining injunctive relief from Defendants. And if the settlement had limited its breadth to providing that injunctive relief in exchange solely for release of the Class's claims for *that relief*, the district court might have been within its discretion to determine the Class's interests were sufficiently aligned for purposes of the settlement. The settlement in this case, however, extended significantly further.

In addition to the injunctive relief sought by the Water Authority, class members asserted claims for monetary damages addressing individualized harms such as mental anguish[9]—claims not shared by the Water Authority. In fact, some class members asserted claims directly *against the Water Authority* for contributing to their injuries. As such, the Water Authority had an interest in maximizing the amount of injunctive relief obtained from Defendants while minimizing the value of (if not undermining entirely) class members' individualized claims for compensatory damages. Class counsel was thus placed in a position where advocating zealously for one client (the Water Authority) could

---

[9] Under Alabama law, "[m]ental anguish includes anxiety, embarrassment, anger, fear, frustration, disappointment, worry, annoyance, and inconvenience." *Horton Homes, Inc. v. Brooks*, 832 So. 2d 44, 53 (Ala. 2001).

12

adversely affect the interests of its other client (the Class).  And this conflict may have manifested itself in the proposed settlement, which reimburses the Water Authority in full for the costs of the GAC system while partially releasing absent class members' individualized claims against Daikin.  This presented a fundamental conflict prohibiting dual representation under Rule 23(g).

We reject any assertion that the conflict may be overlooked simply because the district court found "that the Settlement Agreement is the product of informed, arm's length negotiation by counsel and is fair, just, reasonable, valid, and adequate, notwithstanding the objections that were raised at the Fairness Hearing." The district court's determination that the settlement was "the product of informed, arm's length negotiation" was based on its mistaken conclusion that the Class's interests were aligned with the Water Authority's.  The district court clearly erred in that regard.  And its conclusion that the settlement was otherwise "fair, just, reasonable, valid, and adequate" does not mean the negotiating process itself sufficiently ensured representation of the Class's interests as required under Rule 23(g).

Moreover, the district court could not evaluate whether class counsel adequately advanced the interests of absent class members by looking simply at whether the result of the negotiations seemed fair.  *See Amchem*, 521 U.S. at 621, 117 S. Ct. at 2248 ("[T]he standards set for the protection of absent class members

13

serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness.").  That is why it was critical to accurately determine at certification whether potential conflicts of interest could adversely affect the ability of either class counsel or the class representatives to protect the interests of absent class members.  Given the conflicting interests between the Class and the Water Authority in this case, and in light of the settlement's sacrificing individual claims in exchange for injunctive relief, we cannot be confident the settlement negotiations were structured to adequately protect the interests of absent class members.

This conclusion is reinforced by the Alabama Rules of Professional Conduct, which suggest dual representation was inappropriate under these (admittedly unusual) circumstances.[10]  Alabama Rule of Professional Conduct 1.8(g) states: "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients . . . unless each client consents after consultation . . . ."  Ala. R. Prof'l Conduct 1.8(g).

---

[10] Although state ethical rules may be relevant to our determination of whether approval of the settlement was appropriate, a violation of state ethical rules is neither necessary nor sufficient to establish a violation of federal Rule 23(g).  The issue in this case is not whether class counsel should have been disqualified; it is whether, under the circumstances, adequate structural safeguards ensured absent class members' legal interests were protected, such that it would be fair to bind those absent class members to the settlement.  *See Ortiz*, 527 U.S. at 846, 119 S. Ct. at 2314–15.  That determination does not depend on whether the Alabama Rules of Professional Responsibility were violated.

14

Because Alabama Rule 1.8(g) is based on American Bar Association (ABA) Model Rule 1.8(g), and because both the comments to Model Rule 1.8(g) and an ethics opinion issued by the ABA suggest that rule does not apply to class settlements, Appellees argue Alabama Rule 1.8(g) should not apply to the class settlement at issue in this case. *See* Model Rules of Prof'l Conduct R. 1.8(g) & cmt. 13 (2003); ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 06-438 (2006).

Appellees' reliance on the class-action exception to Model Rule 1.8(g) is misplaced. The ABA's determination that Model Rule 1.8(g) does not apply to class settlements is both sensible and a practical necessity. Requiring class counsel to obtain the consent of each class member before agreeing to a class-wide settlement would be practically impossible in the majority of circumstances. And such a requirement would eviscerate many of the benefits of class resolution. For that reason, among others, it makes sense the ABA does not consider class counsel to "have a full client-lawyer relationship with *each member of the class*." Model Rules of Prof'l Conduct R. 1.8(g) & cmt. 13 (2003) (emphasis added). Consequently, the ABA also does not consider a certified class settlement to be an aggregate settlement requiring the consent of each class member under Rule 1.8(g). *See* ABA Formal Op. 06-438.

But here we are not dealing with allegations of individual class members' conflicting interests, and we are not faced with determining whether each class member needed to consent to a conflict with the Water Authority. Rather, we are dealing with a situation in which the putative Class, as a whole, has interests that conflict with the interests of another co-plaintiff, the Water Authority, who is not part of the Class. The question is thus whether it was permissible for class counsel, without consent, to represent the conflicting interests of multiple plaintiffs, one of which is *not* part of any class, in an aggregate settlement involving a class. In other words, this is not the sort of class settlement contemplated by the ABA's class-action exception to Rule 1.8(g), and the reasoning underlying that exception[11] does not apply in this context.

Further, the ABA has explained that Rule 1.8(g) "*supplements* Rule 1.7 by requiring an *additional* level of disclosure by the lawyer." ABA Formal Op. 06-438 at 2 (emphasis added). Thus, regardless of whether the ABA's class-action exception would negate any *additional* obligations under Rule 1.8(g), it does not

---

[11] The exception articulated by the ABA is based in part on its conclusion that individual class counsel does not "have a full client-lawyer relationship with each member of the class." Model Rules of Prof'l Conduct R. 1.8(g) & cmt. 13 (2003). We need not determine whether, when, or the extent to which, class counsel had an attorney-client relationship with individual members of the Class. We merely point out that the reasoning articulated by the ABA does not apply in the context of a conflict between a putative class as a whole and a co-plaintiff who is not a member of that class.

16

affect class counsel's underlying obligations under Alabama Rule 1.7(b), which

states:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or a third person, or by the lawyer's own interests, unless:
>
> > (1) The lawyer reasonably believes the representation will not be adversely affected; and
> >
> > (2) The client consents after consultation.  When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

Ala. R. Prof'l Conduct 1.7(b).[12]

Nothing in the record suggests class counsel ever consulted Plaintiffs

concerning a potential conflict, much less obtained consent.  Indeed, class counsel

has consistently maintained there was no conflict.  We therefore are not persuaded

by Appellees' arguments that class counsel complied with the Alabama Rules of

Professional Responsibility, and we conclude the district court abused its discretion

by approving the settlement.

---

[12] The commentary to ABA Model Rule 1.7 contains its own class-action exception, but the exception applies only to *unnamed* members of the class.  Model Rules of Prof'l Conduct R. 1.7 & cmt. 25 (2003).  Thus, under the ABA version of the rule, class counsel would appear to have an obligation to both consult the *named* representatives of the class concerning the potential conflict and obtain their consent.

17

*C. Rule 23(b)(2)*

The district court also abused its discretion by certifying a settlement class under Rule 23(b)(2)[13] and approving a settlement that released absent class members' individualized claims for monetary damages. In *Wal-Mart Stores, Inc. v. Dukes*, a unanimous Supreme Court concluded that individualized claims for monetary damages cannot be resolved through a class certified under Rule 23(b)(2). 564 U.S. 338, 360–61, 131 S. Ct. 2541, 2557 (2011). Rather, such individualized claims should be resolved under Rule 23(b)(3). *Id.* at 362, 131 S. Ct. at 2558 ("Given [the structure of Rule 23], we think it clear that individualized monetary claims belong in Rule 23(b)(3).").

As the Court explained:

The procedural protections attending the (b)(3) class—predominance, superiority, mandatory notice, and the right to opt out—are missing from (b)(2) not because the Rule considers them unnecessary, but because it considers them unnecessary *to a (b)(2) class*. When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute. Predominance and superiority are self-evident. But with respect to each class member's individualized claim for money, that is not so—which is precisely why (b)(3) requires the judge to make findings about predominance and superiority before allowing the class. Similarly, (b)(2) does not require that class members be given notice and opt-out rights, presumably because it is

---

[13] Rule 23(b)(2) allows certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

18

thought (rightly or wrongly) that notice has no purpose when the class is mandatory, and that depriving people of their right to sue in this manner complies with the Due Process Clause. In the context of a class action predominantly for money damages we have held that absence of notice and opt-out violates due process. See *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985). While we have never held that to be so where the monetary claims do not predominate, the serious possibility that it may be so provides additional reason not to read Rule 23(b)(2) to include the monetary claims here.

*Id.* at 362–63, 131 S. Ct. at 2558–59.

The Court went on to clarify that Rule 23(b)(2) "should [not] be read to nullify [the protections of Rule 23(b)(3)] whenever a plaintiff class, at its option, combines its monetary claims with a request—even a 'predominating request'—for an injunction." *Id.* at 364, 131 S. Ct. at 2559. Otherwise, the mere fact that a class might be entitled to significant injunctive relief could lead to "the possibility . . . that individual class members' compensatory-damages claims would be *precluded* by litigation they had no power to hold themselves apart from." *Id.* This "possibility underscores the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone—a choice Rule 23(b)(2) does not ensure that they have." *Id.*

*Dukes* thus offers a simple dichotomy: claims seeking declaratory or injunctive relief equally applicable to the entire class may be resolved through

mandatory class litigation under Rule 23(b)(2)[14]; individualized claims for relief (such as the mental-anguish claims at issue here)[15] should be resolved under Rule 23(b)(3), which provides absent class members notice and an opportunity to opt out.

The district court in this case did not apply the rule from *Dukes*. Instead, it determined that a class could be certified (and individualized claims released) under Rule 23(b)(2), as long as the relief provided by the settlement was predominantly injunctive. In other words, the district court applied the predominance test rejected by *Dukes*.

Appellees suggest *Dukes* should not apply here because this case involves class certification for purposes of settlement, whereas *Dukes* involved certification for purposes of litigation. They further contend Rule 23(b)(3)'s procedural safeguards are unnecessary in the settlement context because, under Rule 23(e)(2), the district court can protect absent class members by rejecting settlements that are unfair, unreasonable, or inadequate. *See* Fed. R. Civ. P. 23(e)(2); *Bennett v. Behrig Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (identifying standards by which a district court must assess whether a settlement is fair, reasonable, and adequate).

---

[14] The Court left open the question of whether claims seeking non-individualized monetary damages that are incidental to the requested declaratory or injunctive relief may be resolved under Rule 23(b)(2).

[15] *See Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (describing "pain and suffering, mental anguish and humiliation" as "inherently individual injuries").

20

As an initial matter, we see no basis for exempting settlements from the rule announced in *Dukes*. *See Amchem*, 521 U.S. at 621, 117 S. Ct. at 2248 ("The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments—checks shorn of utility—in the settlement-class context."); *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978)[16] ("Because of the limited control exercised by any particular class member over the decision to engage in these compromises, . . . the settlement process is more susceptible than adversarial adjudications to certain types of abuse. . . .  For this reason, . . . the law accords special protections, primarily procedural in nature, to individual class members whose interests may be compromised in the settlement process."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 241–42 (2d Cir. 2016) (Leval, J., concurring) ("*Dukes* did not involve a settlement agreement, but that does not make its precedent any less applicable to this case.").  If anything, the need for Rule 23's procedural protections is greater in the settlement context.  *See Pettway*, 576 F.2d at 1169 ("[T]he potential for abuse is much greater when class actions are resolved through a settlement.")

---

[16] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Moreover, Appellees' suggestion that Rule 23(b)(3)'s notice and opt-out protections need not apply to a settlement because the district court can reject any settlement deemed unfair to absent class members is foreclosed by binding precedent. *See Amchem*, 521 U.S. at 621–22, 117 S. Ct. at 2248–49 ("[T]he standards set for the protection of absent class members serve to inhibit appraisals of the chancellor's foot kind—class certifications dependent upon the court's gestalt judgment or overarching impression of the settlement's fairness. . . .  Federal courts, in any case, lack authority to substitute for Rule 23's certification criteria a standard never adopted—that if a settlement is 'fair,' then certification is proper."); *Pettway*, 576 F.2d at 1169 ("[*I*]*n addition to* requiring that the trial court evaluate whether a class action settlement is fair, adequate and reasonable and is not the product of collusion between the parties, the law accords special protections, primarily procedural in nature, to individual class members whose interests may be compromised in the settlement process." (emphasis added) (quotation omitted)).  The district court cannot deprive absent class members of the procedural protections of Rule 23(b)(3) merely because it believes a proposed settlement treats those class members fairly.  For the same reason, this Court cannot allow its own evaluation of the Class's best interests to dictate its conclusion as to whether the requirements of Rule 23 were satisfied.

22

Finally, we reject Appellees' contention that approval of the settlement was permissible because it only partially foreclosed the Class's individualized claims. Appellees point out that, because the settlement releases only Daikin, class members can still pursue their individualized claims against 3M and Dyneon. But neither *Dukes* nor Rule 23 allows parties to preclude absent class members' individualized claims against one defendant, as long as those claims can still be pursued against other parties who may have different defenses, levels of culpability, and resources with which to satisfy a judgment.

Put simply, the parties may not accomplish through class settlement what they otherwise would be unable to accomplish through class litigation—precluding absent class members' individualized claims for monetary damages without providing notice and an opportunity to opt out. The district court abused its discretion by failing to apply the correct legal standard for certification under Rule 23(b)(2). *See Dukes*, 564 U.S. at 361–65, 131 S. Ct. at 2557–60.

## III. CONCLUSION

The district court abused its discretion by determining the Class was adequately represented by counsel laboring under an inherent conflict of interest. It also abused its discretion by certifying a class under Rule 23(b)(2) and approving a settlement that released absent class members' individualized claims for

23

monetary damages.  We therefore vacate the class certification, reverse approval of the settlement, and remand for further proceedings.

**VACATED IN PART, REVERSED IN PART, AND REMANDED.**

WILSON, Circuit Judge, dissenting:

The district court concluded that there was no fundamental conflict and that the settlement was fair, reasonable, and adequate. That conclusion falls well within the bounds of its discretion, and resulted in a practical resolution of the issues under the unique circumstances of this case. *See Aldana v. Del Monte Fresh Produce N.A, Inc.*, 578 F.3d 1283, 1288 (11th Cir. 2009) ("[A]buse of discretion review acknowledges that there is a range of choice for the district court and so long as its decision does not amount to a clear error of judgment we will not reverse . . . ."). Nothing that the district court decided concerning this settlement amounted to clear error. The district court undertook a fact-intensive inquiry guided by a limited body of legal precedent and came to a reasonable conclusion in approving the settlement. *See id.* This was, quite simply, not an abuse of discretion.

The Supreme Court's precedent does not prohibit this settlement. *Dukes* concerned whether claims for back pay could be certified in a non-opt out Rule 23(b)(2) litigation class. The Supreme Court was clear that its holding only applied to certification in a Rule 23(b)(2) class, "at least where . . . the monetary relief is not incidental to the injunctive or declaratory relief." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360, 131 S. Ct. 2541, 2557 (2011). The Court

25

emphasized "the need for plaintiffs with individual monetary claims to decide *for themselves* whether to tie their fates to the class representatives' or go it alone." *Id.* at 364, 131 S. Ct. at 2559 (emphasis in original). *Dukes* does not prohibit the settlement here because (1) plaintiffs did not move for class certification for their mental anguish claims under Rule 23(b)(2) and (2) the structure of the partial settlement allows the plaintiffs to litigate for full recovery of their mental anguish claims against the remaining defendants.

Likewise, nothing in Rule 23 prohibits this settlement. Because the settlement was concerned primarily with injunctive relief, it could fit under a non-opt out Rule 23(b)(2) settlement class. *See Dukes*, 564 U.S. at 360, 131 S. Ct. at 2557. Both the Water Authority and the Class want clean water. The Water Authority wants clean water so that it can be serviceable to its customers, and the customers want what they had been paying for—clean water. We cannot speculate as to what the Water Authority and the Class may want in the future. Based on the record before us, their interests are aligned. And pursuant to Rule 23(e)(2), the district court approved the binding class settlement "after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(a)(2).

Nothing in Rule 1.8 of the Alabama Rules of Professional Conduct forbids what the district court did here. The American Bar Association (ABA) decided that its Model Rule 1.8 did not apply to class action settlements, *see* Model Rules

26

of Prof'l Conduct r. 1.8(g) & cmt. 13 (Am. Bar Ass'n 1983), and Alabama's corresponding rule is modeled after the ABA rule, *see* Ala. R. Prof'l Conduct 1.8(g). That rule makes sense, because it would be virtually impossible for counsel to obtain the consent of thousands of class members for every decision made in a settlement. Rather, in a comment to ABA Model Rule 1.8, the ABA states that counsel should comply with all "applicable rules regulating notification of class members and other procedural requirements designed to ensure adequate protection of the entire class." Model Rules of Prof'l Conduct r. 1.8(g) & cmt. 13. Class counsel did exactly that, and there is no dispute over whether it gave notice of the settlement and an opportunity to object to all class members.

Finally, the practicality of this settlement weighs strongly in favor of affirming the district court. Settlement guidelines such as "the complexity, expense and duration of litigation," "the substance and amount of opposition to the settlement," and "the stage of proceedings at which the settlement was achieved," all support the district court's decision. *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). A reversal will result in substantial litigation expenses, whereas relatively few members of the Class object to the settlement. It will result in the Class not receiving credit for the June 2016 water bill at this time. It will forestall the pursuit of additional remedies, including mental anguish damages, against the remaining defendants. And it will result in significantly more interest

27

on the bond for the granular activated carbon filtration system, which will lack settlement proceeds to pay for it.[1]  This interest will be passed on to the Class.  *See* Ala. Code § 11-88-12.

The district court did not abuse its discretion in determining that the settlement was fair, reasonable, and adequate, and that there was no fundamental conflict of interest.  Therefore, I would affirm.

---

[1] The appeal was expedited because the Water Authority anticipated using the settlement proceeds to pay for the bond and did not want to acquire unnecessary interest on the bond.